## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **Evette Nicole Reed,** | § | **Case No. 14-44818-705** |
| | § | |
| Debtor. | § | |
| | § | |
| **In re:** | § | |
| | § | |
| **Pauline A. Brady,** | § | **Case No. 14-44909-705** |
| | § | |
| Debtor. | § | |
| | § | |
| **In re:** | § | |
| | § | |
| **Lawanda Lanae Long,** | § | **Case No. 14-45773-705** |
| | § | |
| Debtor. | § | |
| | § | |
| **In re:** | § | |
| | § | |
| **Marshall Beard,** | § | **Case No. 14-43751-705** |
| | § | |
| Debtor. | § | |
| | § | |
| **In re:** | § | |
| | § | |
| **Darrell Moore,** | § | **Case No. 14-44434-705** |
| | § | |
| Debtor. | § | |
| | § | |
| **In re:** | § | |
| | § | |
| **Nina Lynne Logan,** | § | **Case No. 14-44329-705** |
| | § | |
| Debtor. | § | |
| | § | |
| **In re:** | § | |
| | § | |
| **Jovon Neosha Stewart,** | § | **Case No. 14-43912-705** |
| | § | |
| Debtor. | § | |
| | § | |
| **In re:** | § | |
| | § | |
| **Angelique Renee Shields,** | § | **Case No. 14-43914-705** |
| | § | |
| Debtor. | § | |
| | § | |

### ORDER DENYING BRIGGS'S REQUEST FOR TRANSFER OF THE SANCTIONS MATTERS TO THE U.S. DISTRICT COURT

In this Order, the Court disposes of the request of attorney Ross H. Briggs that the below-described sanctions matters pending against him be transferred to the U.S. District Court for the Eastern District of Missouri (the "U.S. District Court"). To provide context to the request and disposition, the Court will give background as necessary.

On July 31, 2015, Briggs, the respondent to the Court's July 22, 2015 Notice of Intent to Impose Sanctions (the "July 22 Notice") [Docket No. 102],[1] filed a response to said notice (the "Response to the July 22 Notice") [Docket No. 104], requesting that the Court transfer the matter to the U.S. District Court for a *de novo* hearing and determination.[2]  For the reasons set forth below, and in addition to reasons set forth in previous orders of the Court, the Court orders that Briggs's request be denied. The remainder of the Response to the July 22 Notice will be considered in connection with the determination, to be made by separate order, of whether the imposition of sanctions against Briggs is warranted.

## I. FACTS

### A. Background

The July 22 Notice was issued in connection with Briggs's misleading representations to the Court regarding his relationship with a non-attorney named Beverly Holmes Diltz and her business, Critique Services L.L.C.  Therefore, a

---

[1] The Cases are not jointly administered or substantively consolidated. Unless otherwise indicated, docket entry citations in this Order are to the indicated docket number of the first-captioned Case, *In re Reed*. The Court will not indicate the docket number where said order was entered in each of the remaining seven Cases.  Unless otherwise indicated, each order was entered in each Case.

[2] Briggs also requested that the Court transfer to the U.S. District Court the separate sanctions matter pending against him, raised in a Notice issued on July 6, 2015 (the "July 6 Notice") [Docket No. 80].  This is now the second time that Briggs has requested a transfer of the sanctions matter raised in the July 6 Notice.  The Court denied the first request on July 14, 2015 [Docket No. 89].

short background of Diltz and her businesses, and her relationship with Briggs and other attorneys, is appropriate.[3]

***Overview of the Business.*** Over the past twenty years, Diltz has owned, organized and operated various businesses in this District bearing the "Critique" name. These businesses have provided bankruptcy-related services. The current permutation of Diltz's business is Critique Services L.L.C. According to its Articles of Organization filed with the Missouri Secretary of State, Critique Services L.L.C. operates for the business purpose of providing bankruptcy petition preparer services—although Diltz and her business are enjoined by federal court order from providing bankruptcy petition preparer services. As such, the (legitimate) business of Critique Services L.L.C. is murky, at best. Critique Services L.L.C. cannot (legitimately) be a law firm; Diltz is not a lawyer and has been enjoined from the unauthorized practice of law. Critique Services L.L.C. cannot (legitimately) be a bankruptcy petition preparer; Diltz has been enjoined from serving as a bankruptcy petition preparer. What is certain, however, is that, at any given time, one or more attorneys representing themselves to be affiliated with "Critique Services" do an all-cash business at the office of "Critique Services" on Washington Boulevard in St. Louis—and that a great deal of cash flows into that office. In 2013 alone, James C. Robinson, a "Critique Services" attorney (who is now suspended), represented that he was paid over three-quarters of a million dollars in attorney's fees—and that figure is just what was disclosed to the Court on Disclosure of Attorney Compensation statements.

In addition, it is also true that Diltz, her businesses, and its affiliated lawyers and non-lawyers have a long history in this District and across the river, in the Southern District of Illinois, of unprofessional business practices and the unauthorized practice of law. By way of example:

---

[3] Lengthier factual recitations have been set forth in other orders. In addition, the Court anticipates that there will be considerably more detailed factual recountings in coming orders to be entered in these Cases. However, for purposes here, this abbreviated factual recitation should be sufficient.

- Since 1999, Diltz and her businesses and affiliated persons have been repeatedly sued by the U.S. Trustee and have been repeatedly enjoined by the Court in this District from improper and unlawful activities.

- In 2003, Diltz and her businesses were permanently barred by the U.S. Bankruptcy Court for the Southern District of Illinois from conducting any bankruptcy-related business in that district.

- Over the years, at least one attorney—Leon Sutton—was permanently disbarred for his activities while associated with Diltz and her businesses, and two other attorneys—Briggs and Robinson—have been suspended for their activities while associated with Diltz and her businesses.  In addition, attorney Elbert A. Walton was suspended for his activities while representing Critique Services L.L.C.

- In 2014, in the matter of *In re Latoya Steward* (Case No. 11-46399), it was established that Robinson and Critique Services L.L.C. participated in the unauthorized practice of law, failed to render legal services, encouraged the debtor to make false statements on her pleadings, knowingly filed false pleadings, and ran the office in a way that made communication by the client almost impossible.

- Critique Services L.L.C., Diltz and Robinson currently are the subject of yet-another action brought by the U.S. Trustee—this time, in the matters of *In re Williams, et al.* (Lead Case No. 14-44204), which are pending before another Judge of this Court.  The *In re Williams, et al.* matters involved yet-more allegations of unlawful business practices and the unauthorized practice of law, as well as violations of a previous injunction.

***Briggs and the Business.***  Briggs previously was employed as a "full-time staff attorney"[4] for one of Diltz's earlier versions of a "Critique"-named business, and had registered to himself the fictitious name "Critique Services." He left that formal employment relationship in December 2002.  Shortly thereafter, in 2003, he was suspended from the practice of law for six months for his professional malfeasance while associated with the business. Since leaving

---

[4] *Briggs v. LaBarge (In re Phillips)*, 433 F.3d 1068, 1070 (8th Cir. 2006).

4

that formal employment, Briggs nevertheless has maintained ties with Diltz and her businesses.  Today, Briggs has at least an informal, but significant, affiliation with Diltz, her business, and its contracted attorneys.

- With some regularity, Briggs appears at § 341 meetings for attorneys under contract with Critique Services L.L.C., although he does not file Disclosure of Attorney Compensation statements, as required when representing a debtor in a bankruptcy case.

- Briggs offices at the same address as Critique Services L.L.C.'s registered place of business with the Missouri Secretary of State.

- As recently as May 2015, Briggs filed documents in this Court in which he represented that he operates as "d/b/a Critique Services."

- Briggs was the go-to guy following Robinson's suspension, picking up the representation of many of Robinson's clients.

- Shortly after Robinson's suspension was ordered, Briggs attempted to help Robinson violate the terms of his suspension by filing false and misleading Disclosure of Attorney Compensation statements and notices of appearance in cases of Robinson's clients. In those notices and statements, Briggs stated that he would serve as "co-counsel" with Robinson and provide joint representation, and that he would fee-share with Robinson. However, an attorney in good standing cannot serve as co-counsel with an attorney who is suspended, and Briggs could not fee-share in Robinson's fees, since Robinson was incapable of earning them due to his suspension. That is, Briggs tried to use his notices of appearance and statements to help Robinson end-run his suspension and divert Robinson's unearned fees to himself.  Briggs even tried to obtain "cover" for this scheme from another Judge presiding on this Court.  In the matter of *In re Dorothy Galbreath* (Case No. 14-44814), Briggs filed a "Motion for Protective Order," seeking approval of his agreement to be "co-counsel" with the suspended Robinson. In that motion, Briggs mischaracterized the terms of Robinson's suspension by understating the scope of the suspension, stating the suspension meant that Robinson was

prohibited "from filing a bankruptcy or appearing in Bankruptcy Court." (In reality, Robinson had been prohibited, very broadly, from practicing law in any bankruptcy case, under any chapter, in any capacity, before the Court—which, of course, included serving as co-counsel or in joint representation.) To any degree, Briggs obtained no such "protection" from the *Galbreath* judge, who rejected his request, ordered him to file amended documents removing any "joint representation" references, and directed him to represent the debtor in the case without charge.

**Robinson and the Business.** In 2005, Robinson began filing cases in this Court in which he represented himself as affiliated with "Critique Services." In 2007, Critique Services L.L.C. and Robinson entered into a contract pursuant to which Critique Services L.L.C. licenses the name "Critique Services" to Robinson and provides to Robinson bookkeeping and administrative services. From 2007 until mid-2014 (when he was suspended), Robinson was the "face" of the Critique Services business in this Court, operating a high-volume/low cost bankruptcy mill practice that provides low-quality "legal" representation primarily to the working poor of St. Louis (that is, to people who generally lack the resources and time to be able to do anything about receiving poor services). However, in 2013, a former client of Robinson and Critique Services L.LC., the debtor in *In re Steward*, filed against Robinson and Critique Services L.L.C. a pro se motion to disgorge attorney's fees. Soon thereafter, she was able to obtain pro bono counsel. During the litigation of the motion, Robinson and Critique Services L.L.C.—who chose to be represented in the matter by the notoriously unethical attorney Elbert A. Walton[5]—refused to obey discovery orders that required the production of information related to the business. In the process, and along with and through Walton, they committed abuse of process and contempt of court, and made numerous false representations to the Court. Eventually, after enduring months of contempt, on June 10, 2014, the Court

---

[5] *See, e.g., Walton v. LaBarge (In re Clark)*, 223 F.3d 859, 863 (8th Cir. 2000)(affirming disgorgement of attorney's fees where Walton overcharged clients, misused the bankruptcy process for his personal gain, and had a non-attorney prepare and file documents and give legal advice).

6

entered an order granting in part the motion to disgorge. It also suspended Robinson and Walton from the privilege of practicing before the Court for refusal to obey orders, contempt, and making false and misleading statements. Today, Robinson and Walton remain suspended, having failed to even attempt to meet the requirements for reinstatement.

### B.  The Show Cause Orders

Prior to his suspension in June 2014, Robinson agreed to represent the Debtors in their Cases. At the time of his suspension, the Debtors had remitted payment for legal services; however, most of the Case had yet to be filed. In the two Cases that had been filed, Robinson had not yet rendered all legal services owed to the Debtors (for example, the § 341 meetings had not yet occurred).

In November 2014, upon review of the Cases in the course of docket management, the Court learned that Robinson had not returned any of the attorney's fees. This presented a significant issue to administration of the Cases, as unearned attorney's fees paid prior to the petition date become property of the estate when the debtor files for bankruptcy. As such, Robinson appeared to be in wrongful possession of property of the estate. Accordingly, between November 26 and December 10, 2014, the Court issued three Show Cause Orders [Docket No. 19, 21 & 27] against Robinson.

In the first two Show Cause Orders, the Court directed Robinson to show cause as to why he should not be ordered to disgorge his fees pursuant to 11 U.S.C. § 329, and be sanctioned for failing to timely return the fees. After the issuance of the first two Show Cause Orders, Robinson and Briggs (who had taken over representation of six of the eight Debtors) arranged for Robinson to transfer the fees to the Debtors directly. They did so despite the fact that the fees were property of the estate and should have been transferred to the chapter 7 trustees (the "Trustees")—a point that the Court had made clear in its Show Cause Orders, in which it welcomed the return of any unearned fees *to the Trustees*. Robinson and Briggs, both practitioners of bankruptcy law, would have been well-aware that these transfers violated bankruptcy law and the Court's directive regarding return of the fees to the Trustees. Oddly (or, perhaps not so

7

oddly, if Diltz controls the money coming into the Washington Boulevard office), the transfers were not made in cash (the form in which the Debtors had paid the fees), or by checks written from a client trust account (as one would expect from an attorney), or even by checks written from a bank account in Robinson's name. The funds were transferred via personal money orders that appear to have been filled-in and signed by Diltz, although Robinson is listed as the purchaser.

Following the return of all the Debtor's fees, the Court issued the third of the Show Cause Orders, directing Robinson to show cause as to why he should not be sanctioned for wrongfully failing to timely return property of the estate in the form of his unearned fees.

## C. The Motion to Compel Turnover

On December 12, 2014, the Trustees jointly filed a Motion to Compel Turnover [Docket No. 30], seeking turnover of certain documents and information necessary to comply with the Court's directive to them to account for property of the estate in the form of any unearned attorney's fees collected by Robinson.  On January 13, 2015, the Court held a hearing on the Motion to Compel Turnover. Briggs and Robinson were present at the hearing.  Briggs began by insisting that he could not assist his clients by obtaining the documents and information for turnover; however, by the end of the hearing, he suddenly reversed course and stated that he would be "happy" to help obtain the turnover. From the bench, the Court granted the Motion to Compel Turnover and advised that it would issue a written order in a few days. (It ended up taking ten days to prepare the order, as the Court had the daunting task of memorializing the many misstatements of law and misrepresentations of fact made at the hearing).  On January 23, 2015, the Court entered an Order Compelling Turnover [Docket No. 52], compelling Robinson, Briggs, and Critique Services L.L.C., to turn over the documents and information. On February 4, 2015, the Court held a status conference regarding the compliance with the Order Compelling Turnover.  At the status conference, it was established that compliance had not been met.

At the January 13 and February 4 proceedings, Briggs insisted that there is great distance between himself and Critique Services L.L.C.—despite Briggs's

long history of formal or informal affiliation with Diltz's businesses.  He claimed that he was outside the "inner sanctum" of power at the Critique Services business, and argued that he thus was impotent to do anything (despite the fact that it was in his clients' clear interest to obtain the turnover so that accounting could be completed and their Cases could be closed).  He acted as though he had no personal knowledge of who owns Critique Services L.L.C., evading the Court's question, before eventually stammering out the response that it "may be" Diltz—as if he just isn't be sure about who Diltz is.

### D.  The July 6, 2015 Notice of Intent to Impose Sanctions

Between February and June 2015, the Court received no indication that further turnover had been performed.  Accordingly, on July 6, 2015, the Court issued a Notice and Deadline (the "July 6 Notice") [Docket No. 80], in which it gave notice to Robinson, Critique Services L.L.C., and Briggs that it was considering sanctions and/or other actions against them for their non-compliance, and giving them seven days to comply with the Order Compelling Turnover.  The Court also ordered that the Trustees file affidavits attesting to the nature and scope of additional turnover since February 4, and whether he or she has become aware of any additional facts that would bear on the issue of compliance with the Order Compelling Discovery or the representations made on January 13, 2015 or February 4, 2015.

### E.  The Responses and Affidavits Filed in Response to the July 6 Notice

On July 13, 2015, each of the Respondents filed a Response to the July 6 Notice [Docket Nos. 82, 83 & 85].  On July 16 and 17, 2015, the Trustees filed affidavits indicating that no further turnover had been made. In addition, in one of the affidavits, the attesting Trustee attached photographs and a receipt [Docket No. 96], and included the following attestation: very shortly after the January 13, 2015 hearing, the Trustee entered a restaurant and came upon Briggs and a woman, seated closely and conversing. The Trustee overheard remarks (including one of which was vulgar) that indicated that Briggs and his companion were discussing the hearing that had just ended. The Trustee took photographs of Briggs and his companion and made notes of what she witnessed. She

retained her time-stamped receipt. She later provided the photographs to another one of the Trustees, who identified the woman with Briggs as Diltz. The other Trustee filed an affidavit [Docket No. 95], attesting to her identification of Diltz.

### F.  The July 22, 2015 Notice of Intent to Impose Sanctions Against Briggs

In light of the Trustees' affidavits related to Briggs's post-hearing lunch meeting, on July 22, 2015, the Court issued its July 22 Notice, giving Briggs notice that the Court intended to impose sanctions for his misleading statements regarding his relationship with Critique Services L.L.C. and Diltz.  The Court gave him an opportunity to respond and at least two options for responding.  Briggs could (i) agree to: (a) a six-month voluntary suspension from the privilege of practicing before this Court; (b) ten hours of continuing legal education in ethics; and (c) a permanent injunction from ever again doing business with Diltz, her businesses, her employees and independent contractors, and Robinson, related to a case filed in or anticipated to be filed in this Court; or (ii) show cause that sanctions, directives, or referrals were not warranted.

### G.  Overview of Briggs's Response to the July 22 Notice

On July 31, 2015, Briggs filed his Response to the July 22 Notice.  He did not request a hearing.  In his Response, Briggs alleged factual contentions in support of a determination that no cause exists to impose sanctions, and offered legal argument in support of his concurrently made request that the Court transfer the matter to the U.S. District Court for hearing and determination.

In Part II.H below, the Court will outline the factual contentions made by Briggs. However, it will reserve its determination of whether Briggs has shown cause that sanctions are not warranted.  That determination will be made by separate order. In Part III below, the Court will determine the merits of Briggs's request for a transfer to the U.S. District Court.

### H.  Briggs's Factual Contentions in his Response to the July 22 Notice

Briggs claims that he answered honestly when asked by the Court whether he knows who owns Critique Services L.L.C.[6]  However, the transcript shows that when the Court asked Briggs who, to his knowledge, owns and controls "Critique," Briggs first responded by refusing to answer based on his personal knowledge. Instead, he evasively replied, "Missouri Secretary of State has a document—"—a response that had nothing to do with Briggs's personal knowledge.  When the Court rejected that non-responsive answer, Briggs stated, "Mr. Robinson well may be.  It may—may be Beverly Dil[t]z.  It may—but—"  That is, Briggs responded, first, by naming the wrong person, then—with conjured hesitation—by suggesting that it "may be" Diltz.   Then, in his next comment, Briggs again suggested that he has no personal knowledge, remarking that, "That's what the Missouri Secretary of State says.  I assume it's correct." Briggs's performance was a strained exercise in feigned uncertainty.

Briggs claims that his "honesty" is further shown because Diltz is, in fact, the owner of Critique Services L.L.C.  However, the fact that Diltz is the owner of Critique Services L.L.C. is not determinative of whether Briggs made misleading statements about his personal knowledge of that fact.  At the January 13 hearing, the Court wanted to establish a baseline before delving further into the issue of who might be able to obtain what turnover.  The Court wanted to start, if possible, with an acknowledgment by the tap-dancing, name-parsing Briggs of his personal knowledge regarding Critique Services L.L.C. and who might control any documents and information held by that entity.   Instead of answering honestly (something like, "Yes, to my personal knowledge, Diltz is the owner of

---

[6] Briggs also seems to suggest that there was a lack of clarity about which "Critique" entity was being discussed—whether it was the fictional name "Critique Services" or the artificial entity, "Critique Services L.L.C."[6]   However, just moments before Briggs evaded answering as to his personal knowledge, the Court asked him if he understood what the Trustees were requesting by their turnover request, and he confirmed, "I do." And, even if Briggs was not sure of the "Critique" in question, his response still was dishonest.  There was no basis for claiming that Robinson "may be" the owner. Briggs was just trying to look clueless, despite his years of affiliation with Diltz, her businesses and Robinson.

Critique, if you are referring to 'Critique Services L.L.C.'"), Instead, Briggs acted as if he couldn't answer the question about his own personal knowledge. The fact that Diltz is, in fact, the owner of Critique Services L.L.C. is not evidence that Briggs dealt honestly with the Court when he at last—finally and begrudgingly— stated that it was his personal knowledge that Diltz "may be" the owner.

Apparently expecting the Court to be as gullible as he is evasive, Briggs also claims that his post-hearing lunch meeting is not evidence that he mislead the Court about his relationship with Diltz and Critique Services L.L.C.—but instead is evidence of his efforts to comply with the Court's turnover directive. ***This is an openly laughable assertion with absolutely no credibility whatsoever.*** There is nothing—zero—in the record that suggests that Briggs is telling the truth about the circumstances and reason for his meeting with Diltz. At the hearing, Briggs did not suggest that he had any intent to attempt to immediately conference with Diltz. For example, he did not represent: "Your Honor, as soon as this hearing is over, I will contact Ms. Diltz personally and attempt to meet with her." Nothing about Briggs's presentation in court on January 13 suggested that he would attempt to get a quickly scheduled sit-down with Diltz. And, even more tellingly, in the six months after the January 13 hearing, Briggs never disclosed that he had met with Diltz, despite having had many opportunities to do so:

- Briggs did not represent in his January 20, 2015 affidavit [Docket No. 48] that he met with Diltz immediately after the January 13 hearing—despite the fact that the point of the affidavit was to disclose what efforts were undertaken to comply with the turnover directive issued from the bench.

- Briggs did not represent in his January 30, 2015 affidavit [Docket No. 59] that he met with Diltz immediately after the January 13 hearing —despite the fact that the point of the affidavit was to disclose what efforts were undertaken to comply with the Order Compelling Turnover.

- Briggs did not represent at the February 4 status conference that he met with Diltz immediately after the January 13 hearing—despite the fact that

12

this was another important opportunity for Briggs to establish the full scope of his efforts at compliance with the Order Compelling Turnover.

- Briggs did not represent in his July 13, 2015 affidavit [Docket No. 86] that he met with Diltz immediately after the January 13 hearing—despite the fact that this was yet-another chance to establish his efforts at compliance.

- Briggs did not represent in his Response to the July 6 Notice that he met with Diltz immediately after the January 13 hearing—despite the fact that, by this time, Briggs had been ordered to show cause why he should not be sanctioned for failure to comply with the Order Compelling Turnover. Given the gravity of the situation, it defies explanation why—if Briggs really had arranged for such a meeting in an effort to convince Diltz that Critique Services L.L.C. should turn over documents—he would not have mentioned this to the Court when he was under a directive to show cause as to why he should not be sanctioned for failing to comply with the Order Compelling Turnover.

- *In fact, it was not until <u>after</u> Briggs's post-hearing lunch with Diltz was exposed on the record that Briggs suddenly, for the first time, acknowledged his meeting to the Court.*

It is difficult to overstate the lack of credibility in Briggs's explanation of the circumstances of the lunch meeting. There is nothing believable about the contention that the meeting was an effort by Briggs to comply with the turnover directive. However, the fact that the meeting occurred, its timing, and its undisclosed nature is very revealing of Briggs's efforts to mislead the Court about the nature of his relationship with Diltz and Critique Services L.L.C.

Briggs claims that sanctions are not warranted because his lunch meeting "facilitated" Critique Services L.L.C.'s turnover of documents. This is ridiculous. To this day, Critique Services L.L.C. has failed to turn over required contracts and it claims that—despite being Robinson's contracted bookkeeper and administrative services provider—it has no documents related to bookkeeping, accounting, ledgers, and so forth. Whatever Briggs did at the lunch meeting, it did not help to garner compliance.

Briggs also takes umbrage with "any inference that this [lunch] meeting in a public place was clandestine or arranged for an improper purpose." Presumably, Briggs means "implication," not "inference" (or, on the other hand, maybe this was just a psychologically telling slip on his part). To any degree, implications and inferences are beside the point because *the meeting was, in fact, clandestine*. The meeting was clandestine because its occurrence was relevant but was kept secret by Briggs from the Court. (The fact that the meeting occurred at a public venue does not mean that it was any less clandestine; it just means that Briggs did not protect his meeting from revelation to the Court, apparently not having anticipated that a Trustee would happen to select that same place for lunch, in a metropolitan area with at least hundreds of restaurants.) And, Briggs offers no explanation as to why he kept the fact of the meeting a secret from the Court. If the lunch had really been an effort by Briggs to obtain the turnover, there was every reason for him *not* to keep the fact of the meeting a secret from the Court. In addition, the Court notes that it is not interested in Briggs's so-called "objection" to the implication that the lunch was "arranged for an improper purpose." If Briggs doesn't like that the facts imply that he acted with an improper purpose, he might consider, in the future, not acting in a way that implies he has an improper purpose.

### III.  ANALYSIS

In his Response to the July 22 Notice, Briggs insists that he is entitled to "a *de novo* hearing before the District Court on all matters raised by the Court's Orders of July 6, 2015 and July 22, 2015." In support of this request for transfer, he makes several arguments, which the Court now addresses.

**A.  *In re Sheridan***

Briggs argues that the issue of whether he should be sanctioned "implicates non-core matters that exceed the statutory and constitutional power of this Court to enter a final order."  In support of this argument, Briggs relies on *Sheridan v. Michels* (*In re Sheridan)*, 362 F.3d 96 (1st Cir. 2014). However, *In re Sheridan* does not support Briggs's argument; to the contrary, it undermines it.

In *In re Sheridan*, an attorney appealed a sanctions determination against him, arguing that the bankruptcy court lacked the authority to enter a final judgment.  He argued that the matter was non-core under 28 U.S.C. § 157(b) and, thus, that the bankruptcy court had no authority to enter a final judgment without his consent.

In *In re Sheridan*, the bankruptcy court had initiated an omnibus disciplinary proceeding against the attorney, predicated upon alleged ethical-rule violations proscribed by state law. The attorney's misconduct had occurred in multiple, closed bankruptcy cases, extending over a considerable period of time, and "either before multiple bankruptcy judges in a multi-judge district, or entirely or partially outside the presence of the bankruptcy judge who hears the disciplinary case," *id.* at 110, and "much of [the misconduct] allegedly [had] occurred outside the courtroom," *id.*  Additionally, "the disciplinary action against Sheridan had no such purpose or effect [the purpose or effect of being with the view to recovering attorneys fees paid to him], since its remedial goal focused exclusively upon Sheridan's fitness to represent clients in *future* bankruptcy cases, rather than upon any recoupment of estate funds attributable to Sheridan's misconduct. Thus, no matter what the outcome of the disciplinary proceeding against Sheridan, no pending or closed bankruptcy case would be affected unless further independent proceedings were instituted in the future." *Id.* at 108 (emphasis in original).  Considering these facts, the First Circuit reasoned that it "cannot be said [that the omnibus proceeding was] to have involved the sort of routine case 'administration' described in § 157(b)(2)." *Id.* at 107.  Then, finding no ground upon which the proceeding otherwise could have been a core proceeding, and determining that the appellant had not consented to a final

15

disposition by the bankruptcy court, the First Circuit concluded that the bankruptcy court did not have the authority to enter a final disposition. The First Circuit also noted that "[w]here, as here, the attorney misconduct occurred neither in the context of an ongoing bankruptcy case, nor in the presence of the bankruptcy court, the bankruptcy court may have no better vantage from which to make final findings of fact than would the district court." *Id.* at 110.

However, the First Circuit also cautioned:

> We close with a final admonition: our opinion is not to be construed as holding that all attorney disciplinary proceedings before the bankruptcy court are to be presumptively considered non-core. Thus, had the Sheridan ethical violations occurred either during the course of a bankruptcy case or within the immediate presence of the bankruptcy judge, or otherwise directly affected the administration, liquidation, or reorganization efforts, a stronger demonstration might be made for characterizing the disciplinary proceeding as a core matter. *See, e.g., In re Hessinger,* 192 B.R. at 220 (noting that within an individual bankruptcy case a suspension or disbarment of counsel may more readily be regarded as "affecting" asset liquidation, inasmuch as disqualification of counsel normally affects entitlement to attorney fees recoverable from the bankrupt estate, or requires reimbursement of attorney fees previously received, hence increasing the assets available for distribution).

That is, the First Circuit went out of its way to make it clear that *In re Sheridan* does not stand for the proposition that a matter is non-core simply because it involves the imposition of sanctions—the proposition for which Briggs cites it. And it does not stand for the proposition that a party is entitled to a *de novo* evidentiary hearing on sanctions issues before the U.S. District Court.

Moreover, the facts in these Cases are importantly distinguishable from those in *In re Sheridan*.  First, the Show Cause Orders were entered in open cases with the view to returning to the estates property that Robinson had wrongfully withheld and sanctioning him, if proper.  And the July 6 and July 22 Notices were issued with a view to garnering compliance with the Order Compelling Turnover, and to hold the persons accountable for contempt and misleading statements.  Second, the issuance of the Show Cause Orders and the July 6 and July 22 Notices were necessary to ensure proper accounting and

administration of those estates.  The Cases cannot properly be closed under 11 U.S.C. § 350 until such time as the Trustees have accounted to the Court as to all property of the estate. Currently, the Trustees cannot explain where the unearned attorney's fees were held for nearly six months and cannot obtain the documents and information necessary to make that accounting.  They also cannot advise the Court as to whether the withheld fees were earned, in part or in whole—a critical fact necessary for the Court to determine whether Robinson (who insists that the fees were earned in whole) should be sanctioned.  Third, the sanctions here would not be imposed for the alleged violation of state law rules of ethics.  (The Court has been clear: it is considering referring the matters to the Missouri Supreme Court's Office of Chief Disciplinary counsel—an authoritative body well-equipped to take up state law ethics violations by attorneys.[7])  Rather than raising the issue of state law ethics violations, the Show Cause Orders raised the issues of disgorgement under 11 U.S.C. § 329 and sanctions for violations of federal bankruptcy law related to concealing and improperly transferring property of the estate.  And, the July 6 and the July 22 Notices involve the possibility of sanctions for the failure to comply with a federal court order and for the making of false and misleading statements that occurred both in pleadings as well as at hearings before the Court. Fourth, the sanctionable behavior has resulted in delays in administration as well as open contempt of court; as such, the effect of the sanctions is not remote or uncertain. Fifth, the sanctionable behavior occurred "during the course of a bankruptcy case or within the immediate presence of the bankruptcy judge, or otherwise directly affected the administration, liquidation, or reorganization efforts," for which "a stronger demonstration might be made for characterizing the disciplinary proceeding as a core matter," as the First Circuit described in *In re Sheridan*.

---

[7] The Court does not suggest that it cannot sanction for state law ethics violations that occur before it in open cases; it merely has chosen to address the sanctionable behavior that violates bankruptcy law and the authority of the court.

### B.  Consent

Briggs states that he "does not consent to the authority of this Court to enter a final order on the Orders of July 6, 2015 and July 22, 2015."  However, the Court does not need Briggs's consent to sanction him. It is well-established law that the Court may sanction attorneys who appear before it in open matters and may enforce its own orders.

### C.  *Stern v. Marshall*

Briggs argues that *Stern v. Marshall*, 131 S.Ct. 2594 (2011), makes the imposition of sanctions by this Court improper.  Briggs previously made this *Stern v. Marshall* argument to the Court, and it was rejected.  Nevertheless, the Court will state again, as it did in its July 14, 2015 Order Denying Briggs's Request to "Withdraw" the July 6, 2015 Notice or to "Transfer" the Matter for a Hearing Before the District Court [Docket No. 89]:

> Briggs's reliance on *Stern v. Marshall* is misplaced. *Stern v. Marshal* holds that, as a matter of constitutional law, the bankruptcy court lacks the authority to enter a final judgment on a compulsory state law counterclaim that does not arise under Title 11 or in a case under Title 11, even though such authority is expressed codified at 28 U.S.C § 157(b)(2)(C). The issue of whether sanctions for the refusal to comply with bankruptcy court order is not a state counterclaim. It is a matter than arises under Title 11 and the inherent power of the Court to enforce its own orders. *Stern v. Marshall* does not strip the Court from its authority to sanction for refusal to comply with its orders, and the Court does not need Briggs's "consent" to exercise its jurisdiction over the issues set forth in the Notice and Deadline.

### IV.  CONCLUSION

Briggs has not established that he is entitled to an order from this Court directing the transfer to the U.S. District Court of the sanctions matters raised in July 6 and July 22 Notices. As the Court has already explained to Briggs on his prior, similar request for a *de novo* hearing before the U.S. District Court: this Court is an arm of the U.S. District Court and the automatic reference to this Court is a one-way street. The U.S. District Court refers matters here; this Court does not refer its matters upstream.  And this Court certainly does not direct the U.S. District Court as what matters will be placed on its docket for an evidentiary

hearing. There are procedural mechanisms available to Briggs that he can pursue, if he believes that the July 6 and July 22 Notices should be before the U.S. District Court for determination.  However, his request that this Court direct a "transfer back" of the July 6 and July 22 Notices is not an available mechanism. Accordingly, the Court **ORDERS** that that the request for a transfer be **DENIED**.

The Court also notes that Briggs requests that this Court refer the sanctions matters to the U.S. District Court for a determination of discipline by that forum. The Court will keep in mind Briggs's suggestion that the U.S. District Court may be interested in opening a disciplinary proceeding against him. If the Court determines that referring Briggs's actions to the U.S. District Court for a disciplinary proceeding may be proper, the Court will make such a referral at the appropriate time—in addition to whatever sanctions this Court may impose.

DATED:  August 4, 2015
St. Louis, Missouri 63102
erk

CHARLES E. RENDLEN, III
U.S. Bankruptcy Judge

**COPY MAILED TO:**

**Ross H. Briggs**
Post Office Box 58628
St. Louis, MO 63158

**James Clifton Robinson**
Critique Services
3919 Washington Blvd.
St. Louis, MO 63108

**Office of US Trustee**
111 S Tenth St, Ste 6.353
St. Louis, MO 63102

**Robert J. Blackwell**
Blackwell and Associates (trustee)
P.O. Box 310
O'Fallon, MO 63366-0310

**David A. Sosne**
Summers Compton Wells LLC
8909 Ladue Rd.
St. Louis, MO 63124

**Tom K. O'Loughlin**
O'Loughlin, O'Loughlin et al.
1736 N. Kingshighway
Cape Girardeau, MO 63701

**Kristin J. Conwell**
Conwell Law Firm LLC
PO Box 56550
St. Louis, MO 63156

**Seth A. Albin**
Albin Law
7710 Carondelet Avenue
Suite 405
St. Louis, MO 63105

**E. Rebecca Case**
7733 Forsyth Blvd.
Suite 500
Saint Louis, MO 63105

**Beverly Holmes Diltz And Critique Services L.L.C**
Through their counsel, Laurence Mass
230 S Bemiston Ave Suite
1200 Clayton, MO 63105

**Laurence D. Mass**
230 S Bemiston Ave
Suite 1200
Clayton, MO 63105