# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **Evette Nicole Reed,** | § | **Case No. 14-44818-705** |
| | § | |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| **Pauline A. Brady,** | § | **Case No. 14-44909-705** |
| | § | |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| **Lawanda Lanae Long,** | § | **Case No. 14-45773-705** |
| | § | |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| **Marshall Beard,** | § | **Case No. 14-43751-705** |
| | § | |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| **Darrell Moore,** | § | **Case No. 14-44434-705** |
| | § | |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| **Nina Lynne Logan,** | § | **Case No. 14-44329-705** |
| | § | |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| **Jovon Neosha Stewart,** | § | **Case No. 14-43912-705** |
| | § | |
| Debtor. | § | |
| | § | |
| In re: | § | |
| | § | |
| **Angelique Renee Shields,** | § | **Case No. 14-43914-705** |
| | § | |
| Debtor. | § | |
| | § | |

1

## ORDER DENYING MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER

On August 14, 2015, Critique Services L.L.C., one of the respondents to the July 6, 2015 Notice of the Court's intent to impose sanctions (the "July 6 Notice") [Docket No. 80], filed a "Motion to Dismiss or, in the Alternative, to Transfer the Proceedings to [Chief] Judge Kathy Surratt-States" (the "Motion") [Docket No. 107], and a Memorandum in Support [Docket No. 108]. For the reasons set forth herein, the Court orders that the Motion be denied.

## I. BACKGROUND

### A. The Suspension of James C. Robinson

Until his suspension in June 2014, James C. Robinson was an attorney practicing bankruptcy law[1] at the business located at 3919 Washington Blvd. in St. Louis (the "Critique Services business"). The Critique Services business peddles cut-rate bankruptcy services primarily to the work-poor of inner-city St. Louis.  Since at least 2007, Robinson has been under contract with Critique Services L.L.C., and has held himself out to this Court as doing business as "Critique Services" and "Critique Services L.L.C."

Critique Services L.L.C. is not a law firm; it is owned by a non-attorney, Beverly Holmes Diltz, and is one of several "Critique"-named bankruptcy services operations that Diltz has operated and owned over the years. Critique Services L.L.C.'s sole stated business purpose in its Articles of Organization (Attachment A) is to provide "bankruptcy petition preparation service."  However, since 2007, Critique Services L.L.C. has been enjoined by an order of this Court from providing bankruptcy petition preparation services.  As such, it appears that, for the past eight years, Critique Services L.L.C. has not had a stated business purpose that it can lawfully undertake.

---

[1] The Court uses the phrase "practicing law" loosely.  In *In re Steward*, it was established that Robinson rendered no legal services of any value to the debtor. He failed to meet with the debtor prior to agreeing to represent her, shunted work to non-attorney staff (who solicited false statements), and filed the debtor's petition papers, despite knowing that they contained false statements.  The Court concluded that Robinson was, at best, a human rubberstamp who affixed his signature and bar number to documents prepared by non-attorney staff.

Diltz, her various "Critique"-named businesses, and attorneys and non-attorneys affiliated with her business have been repeatedly sued in the past fifteen years for unprofessional and unlawful business practices. Several attorneys affiliated with Diltz's businesses have been sanctioned, suspended or disbarred for their activities related to Diltz's businesses. Diltz and her businesses have been repeatedly enjoined by Court order from unprofessional and unlawful business practices.

On June 10, 2014, in the matter of *In re Latoya Steward* (Case No. 11-46399), Robinson was suspended from the privilege of practicing before this Court on behalf of any other person, for making false statements, willfully refusing to comply with discovery directives, and contempt of court. In addition, Robinson—along with Critique Services L.L.C., and their counsel, Elbert A. Walton, Jr.[2]—were held jointly and severally liable for $49,720.00 in sanctions for their refusal to make discovery about Robinson's business in connection with the litigation of a motion to disgorge fees that was filed by the *Steward* debtor.

### B.  The Debtors' Retention of Robinson

In the months before Robinson's suspension, the debtors (collectively, the "Debtors") in the above-captioned cases (collectively, the "Cases") paid fees at the Critique Services business for services to be performed by Robinson.  At the time of his suspension, Robinson had already filed five of the eight Cases (*In re Moore*, *In re Logan*, *In re Stewart*, and *In re Shields,* and *In re Beard*).  However, in four of those five Cases (*In re Moore*, *In re Logan*, *In re Stewart*, and *In re Shields*), the meeting of creditors required under 11 U.S.C. § 341 had not yet been held—meaning that, when those § 341 meeting were held following his suspension, Robinson could not have appeared on behalf of those Debtors. In the fifth of those five Cases (*In re Beard*), the § 341 meeting had been conducted by the time Robinson was suspended; however, the *Beard* Debtor had not yet

---

[2] Along with Robinson, Walton also was suspended from the privilege of practicing before this Court, for his role in facilitating and promoting his clients' contempt and other bad acts. Robinson and Walton remain suspended to this day, having made no efforts to comply with the terms for reinstatement.

received his discharge, there was a pending motion for relief from the automatic stay, and the *Beard* Debtor had not yet filed his certificate of financial management course—meaning that, as of his suspension, Robinson had not yet completed his representation of the *Beard* Debtor, either.  And, of course, in the three Cases that had not been filed at the time of his suspension (*In re Reed*, *In re Brady*, and *In re Long*), Robinson had not even entered his appearance. Those Cases ultimately were filed by Ross H. Briggs, an attorney with a long-time formal and informal affiliation with Diltz and her businesses.[3]

## C.  The First Two Show Cause Orders

It appeared that, due to his suspension, Robinson could not to have earned all or part of his fees paid by the Debtors.  However, according to the Court's records, as of mid-November 2014, Robinson had not returned to the Debtors any of his fees.  On November 26, 2014, and December 2, 2014, the Court entered two Show Cause Orders [Docket Nos. 19 & 21], directing him to show cause why he should not be ordered under 11 U.S.C. § 329(b) to disgorge any unearned fees or be sanctioned for failing to timely return his unearned fees.[4]  The Court also ordered the chapter 7 trustees assigned to the Cases (the "Trustees") to account for all property of the estates, including property in the form of unearned attorney's fees. The Court provided a directive that any fees returned at that point be provided to the Trustees:

---

[3] Shortly after Robinson's suspension, Briggs took over representation for six of the Debtors who had paid Robinson for services.  Briggs now represents these Debtors on a pro bono basis.  However, Briggs's current efforts to paint his pro bono representation as a noble exercise is undermined by the facts.  Briggs is providing pro bono representation because he was ordered by the Court to do so on June 25, 2014—following his attempt to fee-share and provide "joint representation" with the suspended Robinson.  [Docket No. 7 ("Order (1) Striking the Rule 2016 Statement Filed by Mr. Ross Briggs as to its Representation that Mr. Briggs and the Suspended Mr. James Robinson Will Provide Joint Representation, (2) Determining that Mr. Briggs Is the Sole Counsel of Record for the Debtor and Will Donate His Services to the Debtor, and (3) Directing that Mr. Briggs File a Corrected Rule 2016 Statement and an Affidavit.")].

[4] The professional rules of ethics make it clear that an attorney cannot keep unearned fees, and 11 U.S.C. § 329(b) provides that excessive fees paid to a debtor's attorney can be ordered returned.

> While the Court would welcome Mr. Robinson now voluntarily
> providing to ***the chapter 7 trustee*** any portion of any fees in any
> case that were paid to him but which he did not earn, doing so will
> not make this inquiry moot. The Court still would require the above-
> listed issues to be addressed. The fact that Mr. Robinson
> apparently has not returned any unearned fees raises the concern
> of whether there has been attempted impropriety in these Cases
> related to the attorney's fees paid by the debtor.

(emphasis added).  The Court included this directive because any unearned fees
would not have been property of the Debtors, but would have been property of
the estates, subject to administration unless later abandoned by the Trustees.

### D.  The Return of the Fees

In response to the first two Show Cause Orders, Robinson and Briggs
ignored the directive to return the money to the Trustees. Instead, Robinson
provided the fees to Briggs, who accepted the fees for his six Debtor-clients.
Robinson provided the fees by personal money orders—a peculiar choice of
vehicle for returning unearned client fees.  And, if that wasn't odd enough, the
money orders appear to have been signed not by Robinson, but by Diltz. The
signature for "James Robinson" on the money orders looks nothing like
Robinson's signature as his signature appears on pleadings, although the
signature on the money orders shows a striking similarity to Diltz's script as seen
on documents filed by her companies with the Missouri Secretary of State and on
the supersedeas bond document that she personally posted on behalf of
Robinson, Critique Services L.L.C. and Walton in the appeal of *In re Steward*.

After returning the fees, Robinson claimed that the fees had been
transferred in "settlement" of previously undisclosed (and unscheduled) disputes
between himself and the Debtors.  This was a ridiculous position to take for a
number of reasons—not the least of which was the fact that any claims that the
Debtors may have had against Robinson related to his fees would have been
property of the estates, and only the Trustees had authority to settle such claims.
Robinson and the Debtors were not free to strike their own deal. Robinson also
insisted that the transfers made the Show Cause Orders moot, despite the fact
that the long-delayed return of the fees did not explain (much less excuse)

Robinson's holding of those fees for five months. And, on top of all of this, Robinson insisted (and still insists today) that he actually earned all the fees.

### E.  The Third Show Cause Order

The untimely return of the fees resolved the issue of whether the Court needed to order disgorgement. However, it did not resolve the issue of whether Robinson should be sanctioned for failing to timely return the fees or for any mishandling of the funds while they were missing from the estates. A bad-acting party cannot disappear with estate assets on the hope that the assets will not be missed, return the assets only when called to account, then avoid any accountability by claiming, "No harm, no foul! All is returned!"—which is exactly what it appears that Robinson is trying to do here.

Determining whether it is proper to sanction Robinson begins with an accounting of the property of the estates, to allow the Court to determine whether any of the fees were unearned, and why any unearned fees were not timely returned, and whether there was any mishandling of the fees or malfeasance involving the fees while they were held. To make it clear that the sanctions issue was still under consideration, on December 10, 2014, the Court issued a third Show Cause Order [Docket No. 27], directing Robinson to show cause why he should not be sanctioned for having failed to timely return the fees.

### F.  The Trustees' Motion to Compel Turnover

While Robinson and Briggs were busy moving around money orders, the Trustees remained under the directive to account for property of the estates, including for any unearned fees. On December 3, 2014, the Trustees sent letters to Robinson, Briggs and "Critique Legal Services," requesting that each turn over certain documents and information that would aid the Trustees in making their accounting. Robinson and Briggs each responded with a letter in which each he contended that he had nothing to provide or otherwise refused to substantively respond. Critique Legal Services did not respond at all. On December 12, 2014, the Trustees filed a Motion to Compel Turnover [Docket No. 30], seeking to compel turnover of the documents and information that they had requested by letter. In response to the Motion to Compel, Robinson filed two motions to

6

dismiss [Docket Nos. 40 & 43], one of which baselessly accused the Court of violations of the Fourteenth Amendment of the U.S. Constitution.  The motions to dismiss were denied [Docket Nos. 41 & 44].

On January 13, 2015, the Motion to Compel Turnover came for hearing. Robinson and Briggs appeared, each representing himself.  Briggs tap-danced and avoided answering directly, in an attempt to give the impression that he has no association with Diltz and her business, while claiming that he is incapable of helping his clients obtain the documents and information. Robinson launched unsupported allegations against the Court and the Trustees, made incoherent arguments, interrupted others, and bellicosely argued with the Court. Robinson's contentions about what happened to the fees and his records of those fees made little sense. On one hand, the fees were paid in cash and, receipts were allegedly given to the Debtors for those cash payments; yet, Robinson claimed he had no documents related to those cash payments or the receipts.  No ledger, no accounting, no carbon copies of receipts—nothing to verify who accepted the cash, where it went after being paid, where it was held while being earned, etc.

At the end of the hearing, the Court ruled from the bench, granting the Motion to Compel Turnover and advising that a written order would issue within a few days.  (It ended up taking thirteen days to issue, as the Court faced the daunting task of memorializing all the false statements, misleading arguments, and non-credible representations made by Robinson and Briggs at the hearing.) On January 23, 2015, the Court entered its Order Compelling Turnover [Docket No. 52], directing Robinson, Briggs, and Critique Services L.L.C.[5] to turn over certain documents and information to the Trustees by January 30, 2015.

### G.  Determining Compliance with the Order Compelling Turnover

On February 4, 2015, the Court held a status conference on compliance with the Order Compelling Turnover, at which Briggs appeared on behalf of himself, and Critique Services L.L.C. appeared through its counsel, Laurence

---

[5] It became clear at the January 13 hearing that "Critique Services L.L.C." is the entity to which any turnover directive likely should have been made, rather than to "Critique Legal Services L.L.C." Therefore, the Court directed that turnover be made by both Critique Services L.L.C. and Critique Legal Services L.L.C.

Mass. Robinson did not appear. It was established that compliance had not been met. At the end of the proceeding, the Court took the matter under advisement and stated that it would issue an order.  For the next four months, while the Court considered the terms of an order, no additional turnover was made. The only development was an attempt on May 12, 2015 by Mass to "clarify" the record of the February 4 proceeding [Docket No. 77]—an effort that required the Court to enter an order [Docket No. 78] striking Mass's "memorandum of clarification," to the degree that it sought to modify the record.

### H.  The July 6 Notice of Intent to Impose Sanctions for Failure to Comply with the Order Compelling Turnover

On July 6, 2015, the Court issued its July 6 Notice, giving notice to Critique Services L.L.C., Robinson, and Briggs that it was considering imposing sanctions or ordering the taking of other appropriate action for non-compliance with the Order Compelling Turnover, and giving each seven days to either comply with the Order Compelling Turnover or file a brief, addressing why sanctions or other actions should not be ordered.  The Court also directed each of the Trustees to file an affidavit attesting to: (i) whether any turnover had occurred since the February 4, 2015 hearing and, if so, the nature and scope of such turnover, and (ii) whether he or she has become aware of any additional facts that bear on the issue of compliance with the Order Compelling Discovery or the representations made at the January 13 or February 4 proceedings.

### I.  The Responses to the July 6 Notice

On July 13, 2015, Critique Services L.L.C., Robinson, and Briggs each filed a response to the July 6 Notice [Docket Nos. 82, 83 & 85], contending that sanctions are not proper.  On July 16 and 17, 2015, the Trustees filed affidavits attesting that no further turnover had been made. In one of the affidavits, the attesting Trustee attached photographs and a time-stamped meal receipt [Docket No. 96], and included the following attestation: very shortly after the January 13, 2015 hearing, the Trustee entered a restaurant and came upon Briggs and a woman conversing.  The Trustee overheard remarks (including one of which was vulgar) that indicated that Briggs and his companion were discussing the hearing

that had just ended. The Trustee took photographs of Briggs and his companion and made notes of what she witnessed. She provided the photographs to another one of the Trustees, who identified the woman with Briggs as Diltz. The other Trustee filed an affidavit [Docket No. 95], attesting to identification of Diltz.

**J.  The July 22 Notice of Intent to Impose Sanctions for Briggs's Misleading Statements Regarding His Relationship with Diltz and Critique Services L.L.C.**

On July 22, 2015, the Court issued a Notice to Briggs (the "July 22 Notice") [Docket No. 102], advising him that the Court was considering imposing sanctions upon him for his misleading statements regarding his relationship with Critique Services L.L.C. and Diltz. The Court gave Briggs an opportunity to respond, and advised that he could (i) agree to: (a) a six-month voluntary suspension from the privilege of practicing before this Court; (b) ten hours of continuing legal education in ethics; and (c) a permanent injunction from ever again doing business with Diltz, her businesses, her employees and independent contractors, and Robinson, related to a case filed in or anticipated to be filed in this Court; or (ii) show cause that sanctions or other actions were not warranted.

**K.  Briggs's Response to the July 22 Notice and Request for a Transfer of the Sanctions Determination to the U.S. District Court**

On July 31, 2015, Briggs filed his Response to the July 22 Notice [Docket No. 104].  He did not request a hearing. Briggs included a request that the Court transfer the sanctions matter to the U.S. District Court for determination.    On August 4, 2015, the Court entered an order denying a transfer [Docket No. 105]. In that order, the Court also noted that several contentions made by Briggs about the record were untrue, and observed that Briggs's claim that his post-hearing lunch with Diltz was evidence of his effort to comply with the turnover directive was "an openly laughable assertion with absolutely no credibility whatsoever."

**L.  Briggs's Petitions for Writ of Prohibition**

In his Response, Briggs insisted that this Court—as an Article I court— lacks the power to sanction him.  He argued that this Court thus must transfer the sanctions matter to the U.S. District Court—an Article III court—for determination. In its August 4 order, the Court rejected Briggs's position that it has no power to

sanction him.  In addition, the Court observed that there is no mechanism by which it can "transfer" a matter to the U.S. District Court, as Briggs requested. As the Court explained, this Court receives its cases pursuant to the standing order of automatic reference of the U.S. District Court. The automatic reference is a one-way street: from the U.S. District Court to this Court.  This Court has no authority to "reverse" the U.S. District Court's order of automatic reference. If Briggs believed that the sanctions issue must be determined by the U.S. District Court, he was free to make that argument in a motion to withdraw the automatic reference—a motion that would have been decided by the U.S. District Court. However, Briggs did not file a motion to withdraw the reference.  Instead, on August 6, 2015, he filed a petition for writ of prohibition in the U.S. District Court, suing the undersigned judge in his official capacity. On August 11, 2015, the U.S. District Court dismissed the petition for writ for want of jurisdiction.  On August 12, 2015, Briggs filed a similar petition for writ of prohibition with the U.S. Court of Appeals for the Eighth Circuit.  On August 18, 2015, the U.S. Court of Appeals denied the petition without comment.

## II.  THE INSTANT MOTION

Meanwhile, on August 10, 2015, Mass filed the instant Motion, seeking dismissal of the sanctions proceeding or, in the alternative, a transfer of the sanctions matters to the docket of Chief Judge Surratt-States of this Court.  The Court now determines the merits of the Motion.

### A.  The False and Misleading Statements in the Motion

Before addressing the merits of the Motion, the Court first will identify false and misleading statements made in the Motion.

#### 1.  The False Statements

Mass previously has been warned by this Court not to pass off the work of other lawyers as his own.  On June 20, 2014, in *In re Steward*, Mass took over representation of Critique Services L.L.C. following Walton's suspension. The first documents that Mass presented for filing on behalf of Critique Services L.L.C. had obviously been prepared by Robinson or Walton, and not by Mass.

The Court entered an order [*In re Steward* (Case No. 11-46399) Docket No. 222] rejecting the documents for filing, describing the circumstances:

> Mr. Mass's documents presented for filing are copies of documents previously filed with, or previously presented for filing by, either Mr. Robinson or Mr. Walton—with only the signature block blanked out and with Mr. Mass's signature handwritten and inserted where the previous signature block had been. In one of the documents, Mr. Mass did not even bother to cover up Mr. Robinson's signature block—he simply crossed it out before adding his own, handwritten signature block. Moreover, the documents presented by Mr. Mass refer to being brought by the "Appellants" or "James C. Robinson, Critique Services L.L.C. and Elbert A. Walton"—even though Mr. Mass attests in his handwritten signature block that he represents only Critique Services L.L.C. These documents are a mess. There is no coherent representation as to who Mr. Mass represents or on whose behalf the documents are to be filed. They amount to a poorly executed cut-and-paste job that involved no lawyering effort whatsoever. And, there is not even the pretense that this is Mr. Mass's work. It is clearly the work of the suspended Mr. Walton and the suspended Mr. Robinson.

Yet despite this admonition, Mass apparently has not yet learned the importance of doing one's own lawyering and due diligence.  In the instant Motion, Mass includes false statements made in Briggs's Petitions for Writ of Prohibition:[6]

- Briggs falsely stated in his Petition for Writ of Prohibition that prior to the issuance of the Show Cause Orders, all the Cases had been closed and that the undersigned judge reopened "each [C]ase"; Mass repeats this false statement in Paragraph 7 of his Motion.[7] In fact, however, five of the

---

[6] In addition to making these false statements before a higher court in his petitions for writ of prohibition, Briggs also made these same false statements to another judge presiding on this Court.  On August 27, 2015, Briggs filed a "motion for protective order" in two cases (*In re Seanea Armstrong* and *In re Darrel Battle*) pending before Judge Schermer, asking for a declaration from him that any suspension sanctions that the undersigned Judge might impose in these Cases would be void and unenforceable.  In his motion, Briggs repeated his false statements about the closed status of the cases and the reappointment of the Trustees. On September 1, 2015, the motion for protective order was denied.

[7] Mass falsely states: "In order to do that [issue the Show Cause Orders], Judge Rendlen reopened each case . . . all eight had previously been closed . . ."

eight Cases (*In re Reed, In re Brady, In re Beard, In re Stewart, and In re Shields*) were open at the time that the Show Cause Orders were issued and had never been closed. The Court had even pointed out this fact in its Order of December 3, 2014 [Docket No. 22], observing that "[m]ost of the Cases have not been closed pursuant to § 350(a)."

- Briggs falsely stated in his Petitions for Writ of Prohibition that the undersigned judge reappointed the Trustees in all the Cases; Mass repeats this false statement in Paragraph 7 of his Motion.[8]  In fact, however, in only three Cases (*In re Long, In re Moore,* and *In re Logan*) were the Trustees reappointed; in the other Cases, the Trustees were under active appointment when the Show Cause Orders were issued.[9]

Mass incorporates these false statements into his Motion for the same reason that Briggs made the false statements in his Petitions for Writ of Prohibition—these false statements fit into the fairy tale they are trying to sell: that the sanctions issues are not the result of a failure to return unearned attorney's fees or the result of a failure to comply with the Order Compelling Turnover, but are the result of the Court dredging up "old news."

In addition, Mass makes other false statements, which appear to be the result of either sloppiness or wishful "mis-remembering" the record:

- Mass falsely states at Paragraph 11 of the Motion that Briggs represents all eight Debtors.  In fact, Briggs represents six Debtors—a point that the

---

[8] Mass falsely states: "In order to do that [issue the Show Cause Orders], Judge Rendlen . . . reappointed the Trustees . . . the Chapter 7 Trustees had previously been] discharged . . ."

[9] Mass also falsely states that the Court reappointed the trustees—suggesting that the reappointments were official acts of the Court. However, in its December 3, 2014 Order, the Court recognized that it does not have the power to reappoint a trustee ("the appointment of chapter 7 trustees is an Executive Branch duty executed by the United States Trustee").  While welcoming the reappointment of the Trustees in the Cases where a Trustee was needed, the Court did not reappoint any Trustee; the United States Trustee did.

Court and Briggs have repeatedly noted, and a fact that Mass could have ascertained with only a minimal due diligence.

- Mass falsely states at Paragraph 17 of the Motion that, at the February 4th proceeding, he moved to dismiss the Show Cause Orders or to have the matters transferred to Chief Judge Surratt-States. In fact, as the transcript shows, Mass did not move for either form of relief on February 4. Instead, what Mass did was (i) erroneously and repeatedly insist that the issue here is whether a 2007 injunction enjoining Critique Services L.L.C., which had been signed by Chief Judge Surratt-States, had been violated, and then (ii) suggest that that the sanctions matters here should be before either Chief Judge Surratt-States or the Missouri Supreme Court's Office of Chief Disciplinary Counsel (the "OCDC").[10] However, Mass never actually motioned for dismissal or a transfer. He just complained.

### 2. The Misleading Statements

Mass also makes misleading statements in the Motion:

- Mass claims at Paragraph 10 of the Motion that, after the transfer of the fees on December 6, 2014, "[s]uperficially it appeared that the refunded amounts were property of the bankruptcy estates." The use of the adverb "superficially" is inexplicable, other than to mischaracterize the legal reality. Property either is, or is not, within the estate; there are no degrees of "appearance." Any unearned fees were, in actuality (and not in superficial appearance), property of the estate.

- Mass suggests that the fees were property of the estate only as a technicality, because "[t]he Chapter 7 Trustees supposedly had to abandon their interest in the returned fees . . ." However, the Trustees were *actually*—not supposedly—required to abandon their interests in the

---

[10] His argument regarding the OCDC appeared to be based on the belief that this Court does not have jurisdiction to deal with attorney misbehavior that occurs in cases before it, but that such issue is solely a matter for the OCDC. In addition to being wrong as a matter of law (contrary to Mass's contentions, an attorney can be subject both to the sanctions authority of a court and the disciplinary authority of the OCDC), it also is a cynically convenient position for Mass to take, since his client is not a lawyer and thus is not subject to discipline by the OCDC.

fees before the fees were removed from the estates.  Abandonment is not a trifling technicality.

### B.  Analysis of the Request for Dismissal

Critique Services L.L.C.'s principal position in the Motion is that the Court must "dismiss all proceedings with regard to Critique Services L.L.C." Presumably, by referring to "all proceedings," Critique Services L.L.C. is referring to the determination of whether sanctions should be imposed, as set forth in the July 6 Notice.  However, dismissal is not a form of relief available to Critique Services L.L.C.  Even if the Court declines to impose sanctions, the July 6 Notice would not be dismissed. A Court notice is not a pleading; it does not request relief; it is not subject to dismissal. To interpret the Motion as generously as possible, the Court construes the request to be for a determination that sanctions are not proper and for withdrawal of the July 6 Notice.

1.  **Critique Services L.L.C.'s argument that sanctions are not proper because the fees now have been returned.**

Critique Services L.L.C. argues that the Order Compelling Turnover, itself, was not proper—and thus, noncompliance with the Order Compelling Turnover should not result in sanctions.  In support of this argument, Critique Services L.L.C. contends because all the fees have now been returned, all inquiries into the property of the estates are over and there is "nothing left to litigate"—and, therefore, the Trustees are not entitled to any documentation and information. However, as discussed previously herein, regardless of Robinson's Hail Mary return of the fees, there remain outstanding matters to address related to the fees and administration of the estate.

2.  **Critique Services L.L.C.'s argument that sanctions are not proper because the July 6 Notice did not sufficiently detail how Critique Services L.L.C. failed to comply with the Order Compelling Turnover.**

Critique Services L.L.C. argues that sanctions are not proper because, it alleges, the July 6 Notice does not illuminate for it all the ways in which it has been established that compliance with the Order Compelling Turnover was not met. However, Critique Services L.L.C. has admitted that it did not comply in full

14

with the Order Compelling Turnover.  It admits that it has copies of its contracts with Dedra Brock-Moore and Dean Meriwether (attorneys who have come under contract with Critique Services L.L.C. since Robinson's suspension), and acknowledges that these contracts are subject to the turnover directive. Nevertheless, Critique Services L.L.C. has announced that it will not turn over the contracts.  In addition, the only document of any significance that Critique Services L.L.C. has turned over—a copy of its contract with Robinson—shows that Critique Services L.L.C. has been contractually obligated since 2007 to provide administrative services, including bookkeeping, to Robinson. As Robinson's contracted bookkeeper, Critique Services L.L.C. should have in its custody or control at least some bookkeeping-related documents and information subject to turnover.   However, Critique Services L.L.C. has turned over no bookkeeping-related documents or information whatsoever. Instead, Mass claims that his client never provided any bookkeeping services to Robinson. Meanwhile, Robinson simultaneously claims that he also has no records of his own bookkeeping, although he does not claim that Critique Services L.L.C. was not his bookkeeper.  This appears to be coordinated whack-a-mole game of  "the other guy has it!"—being played on the hope that, if there is just enough finger-pointing and obfuscation, maybe no one will be held accountable. But merely making non-credible claims that there are no documents or information to turn over does not satisfy the Order Compelling Turnover.

### 3. Critique Services L.L.C.'s argument that sanctions are not proper because the Trustees are not entitled to turnover under § 542(e).

Critique Services L.L.C. claims that sanctions are not proper because the Trustees do not have a legal basis for obtaining the documents and information. The Trustees sought, and obtained, a directive for turnover of the requested documents and information pursuant to 11 U.S.C. § 542(e), which provides that:

> Subject to any applicable privilege, after notice and a hearing, the court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee.

15

Critique Services L.L.C. argues that the Trustees are not entitled to obtain the requested documents and information under § 542(e). In support of this position, it relies on *(Wagner v. Dreskin) In re The Vaughan Co.*, 2015 WL 4498748 (Bankr. D.N.M. Jul. 23, 2015). However, *In re The Vaughan Co.* does not stand for the proposition that there is "[no] authority under [§ 542(e)] to seek any records that are not the records of these eight Debtors."

*In re The Vaughan Co.* stands for two propositions related to § 542(e). First, it stands for the proposition that "[t]he plain language of § 542(e) limits turnover or disclosure to existing recorded information and does not require the creation of new information, such as compiling an accounting." *Id.* at *5. That proposition is not relevant here, as the Trustees have not requested the creation of new information. Second, *In re The Vaughan Co.* stands for the proposition that, while "the recorded information subject to turnover under § 542(e) need not itself constitute property of the bankruptcy estate . . . the recorded information must either 1) relate to the property of the estate; or 2) relate to the debtor's financial affairs." *Id.* However, the information at issue here (unlike the information at issue in *In re The Vaughan Co.*) is clearly related to the property of the estate and the debtor's financial affairs. The documents and information subject to turnover relate to determining whether the fees were unearned (and thus were property of the estate), where they were held and by whom and why for months, why they were not returned to the estate earlier, whether the fees were mishandled by Robinson, why the fees were not returned in the same form they were paid, and who actually returned the fees (and if it was not Robinson who purchased the money orders, who was it, and why that person was in control of the property of the estate).

### 4. Critique Services L.L.C.'s argument that sanctions are not proper because Critique Services L.L.C. has nothing to turn over.

Critique Services L.L.C. claims that sanctions are not proper because it cannot be compelled to turn over documents and information over which it has no control or which are not in its custody. The Court has no dispute with the premise that a party cannot be sanctioned for failing to turnover that which it

does not have or control.  However, the Court does not believe Critique Services L.L.C.'s claim that it does not have the documents and information—a claim that flies in the face of other representations, including those in its own contract with Robinson.  The issue here is not whether Critique Services L.L.C. can be compelled to turn over documents and information it does not have; the issue is whether it is proper to sanction Critique Services L.L.C. for not turning over documents and information when the Court does not believe Critique Services L.L.C.'s claim that it does not have the documents and information.

**5. Critique Services L.L.C.'s argument that sanctions are not proper because Critique Services L.L.C. did not receive service.**

At the February 4 proceeding, Mass alleged that "[m]y client was never served with these eight motions to disgorge."  However, there has never been a motion to disgorge filed in these Cases—by anyone or served upon anybody.  There has been the issuance of the Show Cause Orders, which raised the issue of whether disgorgement was proper.  However, Critique Services L.L.C. was not entitled to service of the Show Cause Orders.  The directives in the Show Cause Orders were not directed to Critique Services L.L.C.; they were directed to Robinson and the Trustees.  And there has been the filing of the Motion to Compel Turnover—but that motion did not request disgorgement.

In the five months since February 4, Mass has not made an effort to become familiar with the operative documents in these Cases.  At Paragraph 17 of his Motion, Critique Services L.L.C. again complains about a failure of service of a non-existent motion, stating that, "Critique Services, LLC had not been served with the Motions to Disgorge."  To be as generous as possible, the Court assumes that Mass now refers to the Motion to Compel Turnover (even though the Motion to Compel Turnover does not request disgorgement).

Presumably, Critique Services L.L.C.' s complaint about a lack of service relates to the name-confusion in the Motion to Compel Turnover.  The Motion to Compel Turnover was addressed to "Critique Legal Services" instead of "Critique Services L.L.C."  Critique *Legal* Services L.L.C. is another of Diltz's "Critique"-named businesses. It was dissolved in 2003, following the entry of an injunction

prohibiting Diltz from representing that her business could provide legal services. However, the Trustees—led in part by Trustee Sosne, a much-experienced trustee who remembers the days when Critique *Legal* Services L.L.C. was Diltz's operating entity—inadvertently listed "Critique Legal Services," rather than Critique Services L.L.C. (no "Legal"), in the Motion to Compel Turnover. Critique Services L.L.C. now suggests that, because of this, an injustice is being worked upon it by the turnover directive. The Court is not persuaded.

First, Critique Legal Services L.L.C. was organized and owned by the same person, Diltz, who organized and owns Critique Services L.L.C. Anyone with a modicum of brainwave activity and a shred of intellectual honesty would have known that it was Diltz's almost-identically named, non-dissolved entity, Critique Services L.L.C., that was the intended respondent to the Motion to Compel Turnover, and not Diltz's long-dissolved Critique Legal Services L.L.C.

Second, following the issuance of the Order Compelling Turnover—which issued a directive to Critique Services L.L.C. specifically—Critique Services L.L.C. did not demand corrected service of the Motion to Compel Turnover. It did not request a new opportunity to be heard. To the degree that Critique Services L.L.C. had any ground upon which to complain based on the name-confusion, that ground was waived long ago.

Third, for Critique Services L.L.C. to complain, straight-facedly, about not receiving service of the Motion to Compel Turnover takes unmitigated nerve. As it turns out, Critique Services L.L.C. has made it nearly impossible for it to be served at any address where it is currently located. According to Critique Services L.L.C.'s Articles of Organization, its address is 4144 Lindell Blvd., St. Louis, Missouri. There has been no amendment to that address information. However—as the Office of the Clerk of the Bankruptcy Court recently learned, when it called 4144 Lindell Blvd. to confirm Critique Services L.L.C.'s mailing address for purposes of service[11]—Critique Services L.L.C. has not been at that

---

[11] Attachment B. The Clerk of Court's Office was directed to confirm the business address for Critique Services L.L.C., so that service of the Court's

address for five years.  The only public information that the Clerk of Court's Office could obtain regarding a possible current location for Critique Services L.L.C. was on the website of the Better Business Bureau (which indicates that "Critique Services L.L.C." is located at 3919 Washington Blvd.). By Critique Services L.L.C.'s own design, the Trustees would have had to climb Mount Parnassus to consult the Oracle of Delphi to obtain the address at which Critique Services L.L.C. is currently located.

Fourth—in yet-another brick in the wall of operational opacity at the Critique Services business—"Critique Legal Services" is still advertising its services to the public, despite having been dissolved for more than a decade.  As the Court discovered during its efforts to obtain a current address for Critique Services L.L.C., the 2015-2016 Greater St. Louis Yellow Pages shows a listing for "Critique Legal Services," under the "Tax Preparation Services" subsection[12] (giving its business address as 3919 Washington Blvd. and its phone number as that of the Critique Services business), and the 2015-2016 Greater St. Louis Business White Pages shows a listing for "Critique Legal Services" (again, at the 3919 Washington Blvd. address and with the Critique Services office telephone number.)[13]  Whatever is going on at the Critique Services business at 3919 Washington Blvd., Diltz's Critique Legal Services holds itself out to the public as being a part of it and operates as an advertising alter ego.  And, given that Critique Legal Services L.L.C. is owned by the same woman who owns Critique Services L.L.C., and both limited liability companies have connections to the Critique Services business at 3919 Washington Blvd., it seems fair to say that Critique Services L.L.C. has been on notice of the issues here for many months.

---

orders could be made upon Critique Services L.L.C. at its business office, in addition to being made at its attorney's office.

[12] "Tax preparation" was never part of Critique Legal Services L.L.C.'s stated business purpose.  Critique Legal Services L.L.C.'s only stated business purpose, set forth in its Articles of Organization (Attachment C), was "attorney representation."  Whatever that vague phrase might mean, it does not mean "providing tax preparation services to the public."

[13] Attachment D.

Fifth, it is beyond dispute that Critique Services L.L.C. has known since January 2015 about the turnover efforts and its role in the request, and has had six months to be heard and respond.

**6. Critique Services L.L.C.'s argument that the Court lacks authority to sanction under 28 U.S.C. § 157.**

At footnote 3 of the Memorandum in Support, Critique Services L.L.C. appears to argue that because it has not consented to this Court issuing a final disposition on any non-core matter, the Court cannot issue a final disposition on the sanctions determination. However, this is a core proceeding.  It involves a directive for turnover of property of the estate (making it a core matter under 28 U.S.C. § 157(b)(2)(A) & (E)).  It also involves the exercise of the Court's inherent authority under 11 U.S.C. § 105(a) to enforce its own orders.  The Court does not need Critique Services L.L.C.'s consent to determine sanctions against it for noncompliance with its Order Compelling Turnover.

**7. Critique Services L.L.C.'s argument that the Court cannot sanction under *Stern v. Marshall*.**

Critique Services L.L.C. argues that *Stern v. Marshall*, 131 S.Ct. 2594 (2011), makes the imposition of sanctions improper.  Briggs previously made this *Stern v. Marshall* argument to the Court—twice.  Nevertheless, the Court will state again here, as it has done before in its July 14 Order [Docket No. 89], and again in its August 4 Order [Docket No. 105]:

> reliance on *Stern v. Marshall* is misplaced. *Stern v. Marshall* holds that, as a matter of constitutional law, the bankruptcy court lacks the authority to enter a final judgment on a compulsory state law counterclaim that does not arise under Title 11 or in a case under Title 11, even though such authority is expressly codified at 28 U.S.C § 157(b)(2)(C). The issue of whether sanctions for the refusal to comply with bankruptcy court order is not a state counterclaim. It is a matter that arises under Title 11 and the inherent power of the Court to enforce its own orders. *Stern v. Marshall* does not strip the Court from its authority to sanction for refusal to comply with its orders, and the Court does not need Briggs's [or Critique Services L.L.C.'s] "consent" to exercise its jurisdiction over the issues set forth in the Notice and Deadline.

8.  **Critique Services L.L.C.'s argument that sanctions are not proper because this is an Article I Court.**

Critique Services L.L.C. claims that sanctions are not proper because, it asserts (with no citation to authority), "Bankruptcy Courts, which are not Article III courts, do not have the inherent power as do Federal Courts at the District Court level and above to enforce its Orders through sanctions and/or criminal contempt."  (Critique Services L.L.C.'s Memorandum in Support at 6 n.3.)   In response to this argument, the Court first notes the sanctions contemplated here are of a civil nature.  The Court has never suggested that it might impose criminal sanctions.  The contention that the sanctions would be criminal in nature is a red herring. Second, it is well-established that the bankruptcy courts have the power to sanction. *See, e.g., Elbert A. Walton, Jr. v. John V. LaBarge (In re Clark),* 223 F.3d 859, 864 (8th Cir. 2000)("[Section 105 gives to bankruptcy courts the broad power to implement the provisions of the bankruptcy code and to prevent an abuse of the bankruptcy process . . ."); *Needler v. Cassmatta (In re Miller Automotive Group, Inc.),* 2015 WL 4746246, at *5 (8th B.A.P. Aug. 12, 2015)("Bankruptcy Code § 105(a) provides a bankruptcy court with authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code, and allows the court to "tak[e] action or mak[e] any determination necessary or appropriate to . . . prevent an abuse of process." 11 U.S.C § 105(a) And, a bankruptcy court "may also possess 'inherent power . . . to sanction "abusive litigation practices." ' " *Law v. Siegel,* --- U.S. ---, ----, 134 S.Ct. 1188, 188 L.Ed.2d 146, 2014 WL 813702, at *5 (2014)(citing *Marrama v. Citizen Bank of Mass.,* 549 U.S. 365, 375-376, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007))(quotation marks omitted)."); *In re Young*, 507 B.R. 286, 291 (8th Cir. B.A.P. 2014)(same as *In re Needler*).

9.  **Critique Services L.L.C.'s argument that sanctions are not proper because the Court ordered the reopening of three of the Cases.**

Despite Critique Services L.L.C.'s insinuations to the contrary, there was nothing improper about the Court's reopening of three of the Cases.  Pursuant to 11 U.S.C. § 350, the Court may, for cause, reopen a case. The administration of

estate assets, including the administration of unearned attorney's fees, is cause for reopening a case.  Cause to reopen three of the Cases existed because Robinson had not returned any of his fees, despite his apparent inability to have earned all or some of those fees.  To any degree, nothing about the reopening of the three Cases suggests that Critique Services L.L.C. should not be, or cannot be, sanctioned for failure to comply with the Order Compelling Turnover.

### C.  Analysis of the Request that the Sanctions Issue Be Transferred to the Docket of Chief Judge Surratt-States for Determination

As an alternate form of relief, Critique Services L.L.C. requests that the determination of whether sanctions should be imposed in these Cases be transferred to the docket of Chief Judge Surratt-States. In support of this request, Critique Services L.L.C. claims that the sanctions issue raised in these Cases is not whether it should be sanctioned for violating the Order Compelling Turnover (as the Court has repeatedly identified the issue to be).  Rather, Critique Services L.L.C. claims, the issue is whether Critique Services L.L.C. should be sanctioned for violating an injunction entered in 2007 (the "2007 Injunction") against Critique Services L.L.C. and Diltz in *In re David Hardge* (Case No. 05-43244)—an injunction that was signed by Chief Judge Surratt-States of this Court and which restricts the types of business Critique Services L.L.C. and Diltz may conduct. Currently before Chief Judge Surratt-States, in the matters of *In re Terry L. and Averil Williams, et al.* (Lead Case No. 14-44204), is the issue of whether Critique Services L.L.C. and Robinson violated the 2007 Injunction. Critique Services L.L.C. insists that the sanctions determination here should be made in connection with the determination of the issues raised in *In re Williams, et al.*

Critique Services L.L.C.'s framing of the sanctions issue in these Cases as one involving the 2007 Injunction is a false narrative—and the Court does not casually use the adjective "false." By insisting that the issue is whether the 2007 Injunction was violated, Critique Services L.L.C. is not merely mistaken or confused. It is deliberately presenting a false story.  To review: the Show Cause Orders issued to Robinson do not raise the violation of the 2007 Injunction as an issue.  No notice issued by the Court in these Cases advises that the Court

intends to impose sanctions for violation of the 2007 Injunction. There is no pending motion to enforce the 2007 Injunction. The Motion Compelling Turnover does not allege a violation of the 2007 Injunction.   The Order Compelling Turnover does not refer to the 2007 Injunction. When Critique Services L.L.C. has misguidedly insisted that the issue here involves the 2007 Injunction, the Court has advised—both in writing and from the bench, and in unequivocal terms—that the issue of whether the 2007 Injunction has been violated has not been raised in these Cases.  It is only Critique Services L.L.C. that raises the issue here—and it does so only to protest that the issue should not be determined in these Cases.

Critique Services L.L.C. has pushed this false narrative so often that the Court wrote the following in its May 15 Order [Docket No. 78]:

> Mass states that he "believes" that Critique Service that Critique Services L.L.C.'s "conduct complied with the structure established" in the 2007 injunction—as if Mass's belief is determinative of compliance.  To any degree, it is unclear why Mass feels the need to share his belief on this point with the Court in these Cases, given that the issue of whether the 2007 injunction was violated is currently before another Judge of this Court on motions filed in other cases. It is not an issue in these Cases. This was previously explained to Mass by the Court at the February 4 hearing, after Mass incorrectly insisted that the Show Cause Orders raised the issue. Because Mass appears, once again, to need this pointed out, the Court will, once again, state: the issue of whether the 2007 injunction was violated is not an issue raised for determination in these Cases.  The Show Cause Orders do not refer to the 2007 injunction. There has been no motion to enforce the 2007 injunction. No party is seeking relief under the 2007 injunction. The issue presented by the Show Cause Orders is whether Robinson should be sanctioned for failing to timely return unearned fees that were property of the estate—an issue that is separate from the issue of whether the 2007 injunction was violated.

Critique Services L.L.C.'s obsession with this false narrative makes sense when it is viewed in the context of Critique Services L.L.C.'s real goal.   Critique Services L.L.C.'s goal is not to avoid sanctions being imposed in these Cases for a violation of the 2007 Injunction. It knows very well that the Court does not

intend to impose sanctions for a violation of the 2007 Injunction; the Court has repeatedly said so. Critique Services L.L.C.'s real goal is to avoid having the undersigned Judge determine whether Critique Services L.L.C. should be sanctioned for refusing to comply with the Order Compelling Turnover. So, instead of addressing its real problem (its lack of credibility about the documents and information subject to turnover), Critique Services L.L.C. has decided to create a false narrative about the reason for the sanctions determination—and to attempt to use that false narrative to insist that the sanctions issues raised here should be determined in conjunction with the *In re Williams, et al.*

While Critique Services L.L.C.'s dishonesty on this point cannot be condoned, the Court understands why a transfer must seem like a very appealing option to Critique Services L.L.C. at this point. In the *In re Willams, et al.* matters, the issue of whether the 2007 Injunction was violated was raised by motion of the United States Trustee (the "UST").  Critique Services L.L.C. likely would rather deal with the UST in the *In re Williams, et al.* matters, than answer to the Court in these Cases for refusing to comply with the Order Compelling Turnover. Over the past fifteen-plus years, the UST has repeatedly sued Diltz, her "Critique"-named businesses, and affiliated attorneys and non-attorneys, and the outcome has always been consent injunctions that have proven to be of little use in stopping the problematic behavior. Despite these injunctions, the issue of whether those affiliated with the Critique Services business are committing unprofessional and unlawful behaviors keeps coming up, again and again—only to be resolved by yet-another injunction in which future compliance is promised on paper. For Critique Services L.L.C., the prospect of possibly negotiating yet-another injunction with the UST in the *In re Williams, et al.* matters must seem comparatively palatable. When appreciated in that context, the desperate attempt to recharacterize the issue here as one involving the 2007 Injunction here is seen for what it is: a phony story told for the purpose of getting into a preferred litigation position of dealing only with the UST.

24

### III. CONCLUSION

For the reasons set forth herein, the Court **ORDERS** that all requests for relief made in the Motion be **DENIED**.


CHARLES E. RENDLEN, III
U. S. Bankruptcy Judge

DATED:  September 4, 2015
St. Louis, Missouri
*sec*